418 So.2d 249 (1982)
REEDY CREEK UTILITIES CO., Appellant,
v.
FLORIDA PUBLIC SERVICE COMMISSION, Appellee.
No. 60677.
Supreme Court of Florida.
July 29, 1982.
*250 Lee G. Schmudde, Lake Buena Vista, for appellant.
William S. Bilenky, Gen. Counsel and Virginia Alice Daire, Associate Gen. Counsel, Tallahassee, for appellee.
EHRLICH, Justice.
This cause is before us on direct appeal brought by Reedy Creek Utilities Co. to review Orders No. 9456-A and No. 9998 of the Public Service Commission. We have jurisdiction under article V, section 3(b)(2), Florida Constitution, and we hereby affirm those orders.
In November 1978, Congress enacted the Revenue Act of 1978. Among other things this act reduced the tax rates on corporations from 48% to 46% on taxable income in excess of $100,000. Thereafter, on December 29, 1978, the Public Service Commission opened a docket to investigate the effect of these changes on the utilities under its ratemaking jurisdiction. Among those utilities was petitioner, Reedy Creek, an investor-owned electric utility.
The initial Order No. 8624, which opened the docket, advised the utilities that since the new tax act will result in a "beneficial effect on the earnings of affected utilities," the Commission intended to monitor "the revenues associated with the reduction of income tax liability caused by the enactment by Congress of the Revenue Act of 1978." Recognizing that consumer rates are determined on a projected estimate of costs including taxes, the Commission announced that should this tax reduction result in revenue to the utilities exceeding a fair and reasonable return upon their investment, the utilities could be required to refund these revenues to the consumers.
On January 31, 1979, the Commission issued Order No. 8624-A[1] which further clarified the Commission's stance and outlined the method of calculation.
*251 On March 2, 1979, representatives of the six investor-owned electric utilities that were subject to the said orders, the Commission staff, and a representative from the Public Counsel's office met at an informal workshop to discuss the matter.[2] At all times the utilities maintained that the Commission lacked the authority to order a refund, as this constituted retroactive ratemaking. The Commission, however, maintained that this authority was an inherent power of the Commission.
Realizing that litigation over the disagreement would be costly and time consuming, the parties at the workshop signed a stipulation which was prepared by the representatives of the utilities concerning these revenues, agreeing to a one time refund under certain circumstances limited to the year 1979. The agreement set forth the method for calculating the amount subject to refund.[3]
By Order No. 8783 dated March 22, 1979, the Commission approved the stipulation. By this time it had been determined, however, that only two companies, Reedy Creek and Florida Public Utilities Company, met the criteria for refunding the money.
On April 17, 1980, Reedy Creek forwarded to the Commission documentation computing the refund at $47,833. Reedy Creek arrived at this figure by calculating its taxes first at the 48% bracket and then at the *252 46% rate. The difference, it concluded, was the amount of the money subject to refund.
No response to this calculation was forthcoming from the Commission or its staff, until the Commission issued Order No. 9456 on July 21, 1980, which approved the amount of $47,833 for Reedy Creek's refund.
Thereafter, on September 2, 1980, Reedy Creek drafted a plan to allocate the tax saving among its customers and sought approval from the Commission. On October 3, 1980, before any approval was granted, three commissioners issued Supplementary Order No. 9456-A to clarify Order No. 9456. This order stated that the calculations made by Reedy Creek were made on the "actual tax reduction received by the utility and did not specify the revenue equivalent which the tax saving would translate into as far as the customer is concerned." The amount, it said, should have been increased by an "expansion factor." The amount to be refunded by Reedy Creek was increased to $93,281.
Reedy Creek filed a petition for reconsideration on October 9, 1980, and a full evidentiary hearing was held on April 7, 1981.
On May 6, 1981, the Commission issued Order No. 9998 denying the petition for reconsideration. Reedy Creek filed this appeal, asserting two issues: (1) that there was not substantial competent evidence to support the Commission's finding that the parties had agreed to refund the expanded revenues, and (2) that even so the second order was not issued until two and a half months later, too late to change the first order under the doctrine of administrative finality.
As to the first issue, we have thoroughly examined the record and find that Orders No. 9456-A and No. 9998 are supported by competent and substantial evidence and this Court will not reevaluate the evidence. Florida Retail Federation, Inc. v. Mayo, 331 So.2d 308 (Fla. 1976).
The Commission's first order spelled out its position. Its amended order of January 31, 1979 explained in further detail how the calculation would be made. The stipulation, which no party questions, incorporated by reference both orders. All these documents set forth a formula for calculating the revenues.
At the workshop a representative of the Commission was present to explain the formula. Viewing the documents together with the testimony in the record, it is clear that a utility would be required to refund revenues if and only if it were earning in excess of the range of its authorized rate of return.
Reedy Creek was in this "over-earnings position," or above the "zone of reasonableness" to the extent of $151,309. Of these excess earnings, $47,833 could be attributed to the actual tax decrease, but the revenue collected from the consumer to pay the tax was $93,281.[4]
Reedy Creek insists that the amount contemplated by the stipulation was the tax saved by the company, but it is patent from the record that the Commission intended for a refund to be on the basis of the revenues associated with the reduction in income tax liability and that the parties agreed to this in the stipulation. Reedy Creek's mistake, if any, was a unilateral one.
The Commission staff's failure to detect the miscalculations only compounded the matter, but we find that to be merely a matter of oversight. The evidence is substantial and supports the Orders.
We turn now to the finality of Order No. 9456, and whether or not the Commission erred in amending that order two and a half months later.
Petitioner makes two arguments. First, it points out that under the Commission's own F.A.C. Rule 25-2.64, any request for reconsideration of an order must be made within 15 days after the order is issued. *253 Consequently, the argument runs, the amended order issued in the case at bar, two and a half months later, was void. Petitioner urges that this rule applies to the Commission itself, as the Commission is a party to the proceedings.
We find this position untenable. The Commission is a quasi-judicial body. Sitting in the capacity that it does, it is empowered to promulgate rules which apply to those under its jurisdiction and subject to its regulation. These rules do not apply to the Commission itself, but to those who appear before it. Notwithstanding the almost adversarial stance it must take at times, it is not a "party" at that level.
Petitioner's final argument deals with the time lapse between orders and the doctrine of "administrative finality." The power of the Commission to modify its orders is inherent by reason of the nature of the agency and the functions it is empowered to perform. This inherent authority to modify is not without limitation. In Peoples Gas System v. Mason, 187 So.2d 335 (Fla. 1966), this Court set forth the rule that:
The effect of these decisions is that orders of administrative agencies must eventually pass out of the agency's control and become final and no longer subject to modification. This rule assures that there will be a terminal point in every proceeding at which the parties and the public may rely on a decision of such an agency as being final and dispositive of the rights and issues involved therein. This is, of course, the same rule that governs the finality of decisions of courts. It is as essential with respect to orders of administrative bodies as with those of courts.
Id. at 339. This Court reaffirmed that rule in Austin Tupler Trucking, Inc. v. Hawkins, 377 So.2d 679 (Fla. 1979).
Furthermore, in Peoples Gas System v. Mason, we recognized the unique function that a regulatory commission serves and the necessity that it be granted a certain degree of latitude in order to effectively carry out that function, and we said:
We understand well the differences between the functions and orders of courts and those of administrative agencies, particularly those regulatory agencies which exercise a continuing supervisory jurisdiction over the persons and activities regulated. For one thing, although courts seldom, if ever, initiate proceedings on their own motion, regulatory agencies such as the commission often do so. Further, whereas courts usually decide cases on relatively fixed principles of law for the principal purpose of settling the rights of the parties litigant, the actions of administrative agencies are usually concerned with deciding issues according to a public interest that often changes with shifting circumstances and passage of time. Such considerations should warn us against a too doctrinaire analogy between courts and administrative agencies and also against inadvertently precluding agency-initiated action concerning the subject matter dealt with in an earlier order.
Id. at 339.
Peoples Gas System and Austin Tupler dealt with orders amended four years and two years respectively after their inception and "administrative finality" had attached. The instant case deals with a period of two and a half months. The Commission erred in its Order No. 9456 in approving a refund in terms of the actual tax reduction received by the utility but it sought to correct that error by issuing Order No. 9456-A. While it may have been better procedurally to notify the utility of the proposed changes in order to have afforded the utility the opportunity to request a hearing, nevertheless a full evidentiary hearing was held on Reedy Creek's petition for reconsideration.
The Commission is charged with the statutory duty of regulating and supervising public utilities with respect to their rates. When the Commission determined that it had erred to the detriment of the using public, it had the inherent power and the statutory duty to amend its order to protect the customer.
*254 An underlying purpose of the doctrine of finality is to protect those who rely on a judgment or ruling. We find that Reedy Creek did not change its position during the lapse of time between orders, and suffered no prejudice as a consequence.
A change in a tax law should not result in a "windfall" to a utility, but in a refund to the customer who paid the revenue that translated into the tax saving.
The orders under review are hereby affirmed.
It is so ordered.
ALDERMAN, C.J., and ADKINS, BOYD, OVERTON and SUNDBERG, JJ., concur.
McDONALD, J., dissents.
NOTES
[1] Paragraphs 4, 5, 6, 7 of Order No. 8624-A, subsequently referred to in the stipulation:

(4) Measurement of earnings for refund purposes. Order No. 8624 provides that our initial hearings "shall serve as a basis for attaching jurisdiction over the revenues in question and any accrued thereafter shall be subject to refund or other appropriate disposition depending on the financial condition of the individual utilities." For purposes of measuring the financial condition of each utility for calendar year 1979, we intend to use the same procedures as are employed under our continuing surveillance program. That is, we shall look at the actual per books earnings together with the actual average net investment rate base which calculations will be consistent with the Commission's determination of rate base and operating income in the utility's most recent rate proceeding. From this information, the actual per books achieved rate of return for jurisdictional purposes may be derived. This jurisdictional return shall then be compared with the rate of return calculated by using the 13 month average capital structure for calendar year 1979 and ceiling of the last authorized return on equity. The capital structure shall be developed on a basis consistent with the Commission's determination of capital structure in the utility's most recent rate proceeding.
(5) Disposition of revenues. All "savings" accumulated during 1979 after the date of our order dealing with the initial hearings shall be subject to refund. If the utility's actual earned overall rate of return exceeds the ceiling of the zone of reasonableness, as determined in paragraph (4), the utility shall, after notice and hearing, refund to its customers revenues equal to the lesser of the total calculated differential contained in the reports, or the amount of revenue for 1979 that exceeds that which would have been produced by the ceiling of the utility's rate of return as calculated in paragraph (4).
(6) Refunds. Refunds, if any, shall be made to current customers served by the utility and refund amounts shall be based on each customer's consumption or basic local exchange service during the month immediately preceding the month during which a refund is consummated.
(7) FASB. No. 5. The utilities shall account for the revenues associated with the differential between the 1978 federal corporate income tax rate for calendar year 1979 in accordance with generally accepted accounting principles for contingencies. (Underlining in original)
[2] At the workshop, the representatives of the utilities conferred privately to see if they could agree on a possible stipulation to resolve the issue and avoid litigation. One of their group said, upon a resumption of the workshop meeting:

MR. WILLIS: I would like to outline a proposal which I think has been accepted by the Public Counsel, but let me state basically what the provisions would be and if we do have an agreement then we can wrap it up and come back and maybe execute it this afternoon.
The first provision that we would insist on would be that the company maintains that the Commission lacks the power to engage in retroactive ratemaking, but that in an effort to amicably settle the question and the disposition of revenues associated with the reduction of federal income tax, that the companies would voluntarily agree not to appeal an order of the Commission for refund of the revenues based on the Commission's Order No. 8624-A, and as specifically described in Paragraphs 4, 5, 6 and 7 of the order; that while we also feel very strongly that the Commission would not have the authority to require refunds to be made back to the beginning of the year, that we would accept that as part of a negotiated settlement, that the tax savings involved would be calculated on the basis of calendar year 1979. (Transcript, Workshop, March 2, 1979, at pages 36-37.)
[3] The stipulation provides in part:

1. The Companies, although they firmly maintain that the Commission lacks the power to engage in retroactive ratemaking as may be contemplated by Order Nos. 8624 and 8624-A, in an effort to amicably settle the question of the disposition of the revenues associated with the reduction by the Revenue Act of 1978 of the federal income tax rates voluntarily agree to the incorporation of this stipulation into an order and not to appeal such order by this Commission for a refund of such revenues to be determined and refunded only on the basis described in paragraphs (4), (5), (6) and (7) of Order No. 8624-A.
[4] It appears to be the practice of utilities to pass through as an expense to the customer, the payment of income taxes and in so doing the utility collects roughly twice as much from the customer as it expects to pay in income taxes.